UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Alison Sanders, individually and as
trustee for the heirs and next of kin of
Alfred Charles Sanders,

           Plaintiff,

      v.

City of Minneapolis; Robert Olson, Chief
of Police; Valorie Goligowski; Hien Dinh;
Lupe Herrera; Matthew Blade; Josef Garcia;
Augsburg College Security and Wolf Protection
Agency;[1] Steven Manhood, Minneapolis Park Police,

           Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 03-5817 ADM/AJB

---

Richard A. Olivito, Esq., Olivito Law Office, Boardman, OH, and local counsel Karlowba R. Powell, Esq., Walker Law Office, P.A., Minneapolis, MN, argued for and on behalf of Plaintiff.

Timothy S. Skarda, Esq., Assistant City Attorney, Minneapolis, MN, argued for and on behalf of Defendants City of Minneapolis, Robert Olson, Valorie Goligowski, Hien Dinh, Lupe Herrera, and Matthew Blade.

Kristin R. Eads, Esq., Faegre & Benson LLP, Minneapolis, MN, argued for and on behalf of Defendants Josef Garcia and Augsburg College Security.

Ann E. Walther, Esq., Rice, Michels & Walther LLP, Minneapolis, MN, argued for and on behalf of Defendant Steven Manhood.

---

# I. INTRODUCTION

On November 2, 2005, oral argument before the undersigned United States District Judge

---

[1] Plaintiff's attorney initially believed Augsburg College contracted its security work to Wolf Protection Agency; however, this was apparently incorrect [Docket No. 3]. Although Defendant Josef Garcia maintained employment with both Wolf Protection Agency and Augsburg College, he was not working for Wolf Protection Agency the day of the incidents in question. Because Plaintiff has not argued or briefed a claim against Wolf Protection Agency, it will be dismissed from the lawsuit.

was heard on Defendants' Motions for Summary Judgment [Docket Nos. 38, 41, 81].[2] In her Complaint ("Complaint") [Docket No. 1], Plaintiff Alison Sanders ("Plaintiff"), individually and as trustee for the heirs and next of kin of Alfred Charles Sanders ("Sanders") alleges Defendants violated Sanders' constitutional rights on November 1, 2000. Plaintiff also alleges a claim of negligence, an Americans with Disabilities Act claim, a federal conspiracy claim, and Monell claims against Defendants. Plaintiff failed to respond to Defendants' Motions for Summary Judgment on Plaintiff's negligence claim. As a result, judgment is entered for Defendants' on this count. Additionally, for the reasons set forth herein, judgment for Defendants is appropriate on the remaining counts. Defendants have also filed a Joint Motion for Sanctions [Docket No. 116], which is granted.

## II. BACKGROUND

**A.    Incidents Prior to Sanders' Arrival in the Alley**

A fast evolving and sometimes confusing sequence of events leading to Sanders' death occurred on November 1, 2000. That morning, Defendant Josef Garcia ("Garcia"), employed as a security guard for Augsburg College, was patrolling Augsburg property in a security vehicle. Garcia Dep. (Eads Aff. [Docket No. 84] Ex. 1) at 32. During his shift, Garcia witnessed a car driving on the sidewalk. Id. at 37-38. Garcia followed the car and radioed Augsburg's security dispatch with his location, and requested that dispatch contact the City of Minneapolis Police

---

[2] Defendants City of Minneapolis ("Minneapolis"), Robert Olson, Valorie Goligowski, Hien Dinh, Lupe Herrera, and Matthew Blade jointly filed a Motion for Summary Judgment [Docket No. 41]. Defendants Josef Garcia and Augsburg College also filed a joint Motion for Summary Judgment [Docket No. 81]. Finally, Defendant Steven Manhood filed his own Motion for Summary Judgment [Docket No. 38]. Collectively, these parties will be referred to as "Defendants."

Department.  Id. at 41-45, 48-51, 58-59.  The Augsburg dispatcher contacted the Minneapolis Emergency Communications Center ("MECC") at 7:17 a.m. and informed them of the situation.  Blade Dep. (Skarda Aff. [Docket No. 79]) at 19; Goligowski Aff. (Skarda Aff. Ex. B) at 18-19.

While following the car, Garcia occasionally activated the amber lights on his vehicle when he believed the car was presenting a hazard.  Garcia Dep. at 51.  On occasion, Sanders, the driver of the car, would stop suddenly, put his car in reverse, and drive directly at Garcia.  Id. at 63-64, 66-71.  At one point, Garcia lost track of Sanders, but again spotted Sanders' car as Garcia headed back to the Augsburg campus.  Id. at 82.  Garcia made no attempt to pull Sanders over.  Id. at 45, 75, 77-79; Garcia Aff. [Docket No. 85] ¶ 7.  Garcia did not know why Sanders was driving erratically, but assumed that he was impaired.  Garcia Dep. at 64-65.  Finally, after about ten to fifteen minutes of driving in Garcia's view, Sanders pulled into an alley and parked in a parking space.  Id. at 49, 83-84.  During the time Garcia followed Sanders, Garcia was unable to communicate directly with the Minneapolis police department; nor was Augsburg security dispatch able to communicate directly with the Minneapolis patrol officers, including the other individual Defendants, who responded to the dispatch request.  Pack Dep. (Eads Aff. Ex. 2) at 23-26; Goligowsky Dep. at 19-20, 23-24.

Following the Augsburg dispatcher's call to MECC, Defendant Minneapolis Police Department Officers Valorie Goligowski ("Goligowski") and Lupe Herrera ("Herrera") were dispatched.  Blade Dep. at 21; Goligowski Dep. at 18-19; Dinh Dep. (Skarda Aff. Ex. C) at 13.  Shortly thereafter, Defendant Officers Matthew Blade ("Blade") and Hien Dinh ("Dinh"), also Minneapolis police officers, advised Goligowski and Herrera that the driver of the car, Sanders, was a possible crisis candidate that Blade and Dinh were aware of from a call the previous day.

Dinh Dep. at 17, 22; Goligowski Dep. at 27, 41-42.  Although Blade and Dinh had attempted to locate Sanders on the previous day, they had not encountered or met Sanders prior to the incidents of November 1, 2000.  Dinh Dep. at 17.  At 7:28 a.m., Goligowski and Herrera were flagged down by a citizen near the intersection of Portland Avenue South and 38th Street and told of a hit and run incident potentially involving the suspect car.  Goligowski Dep. at 25, 31, 42.  About ten minutes later, at 7:39 a.m., MECC informed the officers that the suspect car had parked in the alley behind 3428 Chicago Avenue South.  Blade Dep. at 22, 24; Dinh Dep. at 22; Goligowski Dep. at 51-52, 107.  The officers arrived in the alley about ten seconds later.  Blade Dep. at 25-26; Goligowski Dep. at 107-08.

At the time MECC informed Goligowski and Herrera of the erratically driven car, Defendant Steven Manhood ("Manhood"), a Minneapolis Park and Recreation Board officer, was monitoring the police channel on which the call went out.  Manhood Dep. (Walther Aff. [Docket No. 76] Ex. A) at 30-31; Manhood Statement (Walther Aff. Ex. B).  Manhood also heard over the radio that the suspect was a possible crisis candidate.  At 7:38 a.m., Manhood advised his dispatcher that he was assisting.  Walther Aff. Ex. C.  Manhood continued to receive updates over the radio, learning that Sanders had parked his car in the alley behind 3428 Chicago Avenue South.  Manhood Dep. at 41; Walther Aff. Ex. B.  Manhood parked his vehicle in front of 3428 Chicago Avenue South at 7:39 a.m., approximately ten seconds after the Minneapolis police officers arrived on the scene.  Manhood Dep. at 42; Walther Aff. Ex. C.  Prior to his arrival at the scene, Manhood had not communicated directly with any of the other officers present.

**B.     Incidents Following Sanders' Arrival in the Alley**

4

After Garcia, the Augsburg security guard, arrived in the alley, he stepped out of his security vehicle with his security baton. Garcia Dep. at 78, 104. Garcia's vehicle was parked in a manner that allowed room for Sanders' car to leave the alley, had he chosen to do so. Id. at 78-79, 176-77. Garcia, who was standing about fifteen to twenty feet from Sanders' car, did not approach Sanders, but instead waited for the police to arrive. Id. at 78, 84-87, 101-02, 104-05. Approximately two minutes later, the Minneapolis police officers arrived. When the police arrived at the scene, Goligowski approached Sanders' car and demanded that he "put his hands up." Blade Dep. at 32; Dinh Dep. at 26-27; Goligowski Dep. at 57, 59, 63. Goligowski then observed Sanders reach between the two front seats of his car. Goligowski Dep. at 59, 61, 63. Fearing Sanders may have been reaching for a weapon, Goligowski drew her service weapon. Id. at 64, 67. Sanders then looked over his left shoulder, put his car in reverse, and accelerated towards Garcia's vehicle. Id. at 64, 68; Blade Dep. at 38; Dinh Dep. at 27-28, Garcia Dep. at 98. The police officers testified that at this point, they believed Garcia would be trapped or hit by Sanders' car. Blade Dep. at 65-66; Dinh Dep. at 28; Goligowski Dep. at 64. To avoid being hit by Sanders' car, Garcia, now on foot, ducked out of the alley. Garcia Dep. at 100, 103. Sanders' car then struck Garcia's vehicle. Id. at 126. During the time Sanders was backing towards Garcia's vehicle, Goligowski attempted to open Sanders' driver's side door in an attempt to pull Sanders out of his car, but was unable to do so because the door was locked and the window was up. Blade Dep at 38; Goligowski Dep. at 68, 72, 74.

After Sanders' car collided with Garcia's vehicle, Sanders put the car in forward and began accelerating in the direction of Blade, who was standing in the middle of the alley. Blade Dep. at 38-39; Dinh Dep. at 29; Goligowski Dep. at 75. Blade, who testified that he believed he

5

was going to be run over, fired his service weapon at Sanders through the front windshield while simultaneously moving to the side of the alley to avoid Sanders' car. Blade Dep. at 37-41; Dinh Dep. at 29; Goligowski Dep. at 75. After passing Blade, Sanders' car continued down the alley towards Herrera, who jumped out of the way of the car while firing her weapon as the car passed her. Goligowski Dep. at 100. During this time period, Goligowski believed Blade was trapped under Sanders' car. Id. at 99-100. At approximately the same time, Manhood arrived at the scene in the alley, having parked his vehcile in front of 3428 Chicago Avenue South. Manhood Dep. at 42-43. Manhood arrived in time to see Sanders' car accelerating at the officers, and believed Sanders was attempting to run over the officers. Manhood Statement at 3-4. Manhood is unsure when he discharged his service weapon. Manhood Dep. At 52. Finally, Sanders' car crashed into squad 320. Blade Dep. at 41, 66; Dinh Dep. at 34; Goligowski Dep. at 83, 88. The officers, believing Sanders was attempting to dislodge his car from squad 320 and seeing him continue to reach between the front seats, continued to fire at Sanders. Blade Dep. at 44, 66, 69; Dinh Dep. at 34-36; Goligowski Dep. at 100-02, 122. Dispatch records indicate the shooting took place at 7:39:28 a.m., eighteen seconds after the police arrived in the alley.

The officers determined that Sanders was dead at the scene. The Hennepin County Sheriff's Office Crime Laboratory report on the incident indicates that the Sheriff's Office recovered five weapons from the officers. Crime Laboratory Report (Eads Aff. II [Docket No. 90] Ex. 8). A report authored by Kurt Moline shows that the bullets recovered at the scene match these weapons. Moline Report (Eads Aff. II Ex. 11). Sanders sustained 14 gunshot wounds. Autopsy Report [Docket No. 155]. No alcohol or drugs were found in Sanders' body. Id. No weapons were found in Sanders' car.

## III. DISCUSSION

**A.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     42 U.S.C. § 1983 Excessive Force Claim**

The use of force during an arrest implicates the Fourth Amendment right to be free from unreasonable seizures.  Graham v. Connor, 490 U.S. 386, 394 (1989).  The force employed by officers effectuating an arrest must, given the circumstances of the arrest, be objectively reasonable.  Wilson v. City of Des Moines, Iowa, 293 F.3d 447, 451 (8th Cir. 2002) (citing Graham, 490 U.S. at 397).  Generally, it is not objectively reasonable to "seize an unarmed, nondangerous suspect by shooting him dead."  Brosseau v. Haugen, 125 S. Ct. 596, 598 (2004) (citation omitted).  However, if a suspect "poses a threat of serious physical harm, either to the officer or to others," the use of deadly force to prevent escape is not unreasonable under the

Fourth Amendment.  Id.  Additionally, the Eighth Circuit has found that when an officer believes a suspect intends to run him down with a car, the use of deadly force can be objectively reasonable.  Hernandez v. Jarman, 340 F.3d 617, 623 (8th Cir. 2003).

As a threshold matter, Defendant Augsburg College can not be held liable on a 42 U.S.C. § 1983 excessive force claim.  To show that an employer is liable under § 1983, Plaintiff must demonstrate "that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation."  Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001).  Beyond Plaintiff's bare allegations, no evidence has been cited to support Plaintiff's general claim that Augsburg's security training was inadequate and likely to lead to constitutional violations.  Consequently, Plaintiff's § 1983 claim against Augsburg fails.

As to the remaining individual Defendants, all the officers fired at Sanders and each has asserted that Sanders posed a threat of serious harm to themselves or the other officers.  The undisputed evidence shows that following the officers' arrival in the alley, Sanders backed into Garcia's vehicle, and then traveled forward, first in the direction of Officer Blade, then in the direction of Officer Herrera, finally coming to rest when Sanders' car collided with squad 320.  Blade testified that he began firing because he believed Sanders' car, which had just struck Garcia's vehicle and was headed at him, would harm him.  Blade Dep. at 27, 38-40.  Officers Dinh and Goligowski also believed Blade would be struck by Sanders' car as he drove at Blade.  Dinh Dep. at 29; Goligowski Dep. at 75.  Goligowski, in fact, believed that Blade had been hit by Sanders and was trapped under Sanders' car.  Goligowski Dep. at 75.  Although the final outcome of the shooting proved tragic, the undisputed evidence demonstrates that the officers, from an objective viewpoint, acted reasonably.  The officers reasonably feared for their lives, or

believed the lives of their fellow officers were in danger, and acted accordingly. Using deadly force should, of course, be a last resort. In the instant situation, the officers were left with no other viable option. The undisputed evidence is that Sanders' car was driven directly at two of the officers. Thus, the officers acted reasonably, and Plaintiff's excessive force claim is denied.

Additionally, no credible evidence has been presented that Garcia used force of any sort against Sanders. Plaintiff has presented two pieces of evidence in an attempt to create a material issue of fact regarding whether Garcia fired any shots at Sanders. Garcia testified that he was not armed on the day the events took place. Garcia Dep. at 23-24, 30; Garcia Aff. ¶ 3. This is consistent with the testimony of all of the officers, who testified they witnessed Garcia carrying only his baton. Blade Dep. at 34-35; Goligowski Dep. at 62-63; Manhood Aff. [Docket No. 75] ¶ 3. It is also consistent with forensic evidence, which indicates five weapons were fired at the scene. Crime Laboratory Report. Nevertheless, Plaintiff advances the theory that Garcia fired a weapon at Sanders. First, Plaintiff offers the statement of eyewitness Emanuel Ondov ("Ondov"). Ondov offered a statement to the Minneapolis Police Department claiming he witnessed five or six police officers standing in a semi-circle firing at Sanders' car. Ondov Statement (Eads Aff. II Ex. 9). Plaintiff concludes from this statement that Garcia was one of the shooters. Additionally, Plaintiff cites changes in the MECC logs as evidence that Garcia shot Sanders. In the final version of the MECC logs, the incident contains a "shoot" code that was not in earlier versions. Wallin Aff. [Docket No. 145] Ex. 2. Because the code is placed at a time before the actual shooting, Plaintiff avers this is evidence that Garcia shot Sanders before the officers arrived on the scene. Plaintiff also argues that various aspects of the forensic evidence indicate Garcia was one of the five shooters.

9

None of these pieces of evidence, however, are sufficient to create a genuine issue of material fact. The statement of Ondov fails to raise an issue of fact. As a threshold matter, the statement itself is hearsay. The statement was taken by a police officer investigating the incident. Ondov, who is available but apparently prefers not to be involved in the lawsuit, has not made a sworn statement in this suit. As a result, the statement can not be considered for purposes of summary judgment. <u>Firemen's Fund Ins. Co. v. Thien</u>, 8 F.3d 1307, 1310 (8th Cir. 1993). Even if it were considered, the vague nature of the allegation ("five or six officers") by the witness is insufficient to contradict the clear weight of the evidence, all of which suggests that Garcia did not have a weapon at the scene of the incident. In regard to the MECC logs, Plaintiff cites to a log that was updated after the shooting had occurred. MECC logs are regularly updated as situations progress; therefore, the shooting code was added after the shooting had actually occurred. Wallin Aff. ¶¶ 6-10. Thus, the MECC logs do not create a material fact issue. Finally, the conclusions drawn by the Plaintiff from the forensic evidence are supposition. Plaintiff has cited no expert testimony to contradict the assertions made by Defendants' expert.[3] As a result, the evidence proffered by Plaintiff is mere speculation, and therefore is insufficient to raise a genuine issue of material fact.

Plaintiff also raises a number of unsubstantiated inferences in an attempt to avoid summary judgment. For example, Plaintiff cites the failure of Defendant Herrera to maintain her composure during her deposition as evidence that the Defendants were at fault for the incidents

---

[3] As will be discussed in further detail, Plaintiff's only expert witness was withdrawn.

of November 1, 2000.[4]  Nothing specific in Herrera's deposition, however, points to this conclusion.  Thus, judgment is appropriate on Plaintiff's § 1983 claim.

**C.     Conspiracy Claim**

In addition to the excessive force claim, Plaintiff sues under 42 U.S.C. § 1985 for a conspiracy theory.  Section 1985(3) states:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To state a claim under this section, Plaintiff must demonstrate: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.  United Bhd. of Carpenters & Joiners, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828-29 (1983).

Plaintiff has presented no evidence that prior to the events of November 1, 2000, the Defendants met for the purpose of planning a constitutional deprivation of anyone.  Instead,

---

[4] Officer Herrera has been diagnosed with Post Traumatic Stress Disorder.  Herrera Dep. (Skarda Aff. II [Docket No. 111] Ex. A) at 31.  During her deposition, Herrera confirmed her statement to the Hennepin County Sheriff's Department and made attempts to discuss the incidents of November 1, 2000.  Id. at 23-24.  Her statement and deposition testimony are consistent with the accounts of her fellow officers.

Plaintiff's theory is that a conspiracy is established because the Defendants allegedly acted in concert on the day of Sanders' shooting. Plaintiff's theory fails for many reasons. Chief among these reasons is the failure of Plaintiff to demonstrate that Sanders was deprived of any constitutional right. Additionally, there is no evidence that the Defendants conspired, or participated in acts in furtherance of a conspiracy. There is no evidence that Defendants had anything but cursory communications prior to the events of November 1, 2000. On the day of the shooting, most of the Defendants did not have the capability to communicate with each other prior to their arrival in the alley. Rather, they communicated through their dispatchers. Consequently, because there is no evidence that the Defendants conspired against Sanders and because Sanders was not denied a constitutional right, Plaintiff's § 1985(3) claim fails.

D.  **Americans with Disabilities Act Claim**

Plaintiff has also asserted an Americans with Disabilities Act ("ADA") claim based on Sanders' mental illness. However, ADA claims can only be maintained against public entities. 42 U.S.C. § 12132. Therefore, ADA claims can not survive if based on the acts of an individual. Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999). As a result, Plaintiff's ADA claim against the individual Defendants fails.

Although the Eighth Circuit has not addressed the issue of whether a municipality can be held liable under the ADA for failure to properly train police officers on methods for handling mentally ill individuals, the Fifth Circuit did so in Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000). The court held in that case that failure to train officers to deal with mentally ill persons did not create an ADA claim. Id. at 800-01. Even if the Eighth Circuit were to find such a claim viable, the Plaintiff has not demonstrated that any such training would have changed the result

here. There is only scant evidence that the officers were aware they were dealing with a mentally ill individual. Mentally ill drivers can, of course, use deadly force. The fact remains that the Defendants reacted reasonably to a life-threatening situation. Although the result ultimately proved tragic, because their actions were reasonable, Defendants can not be held legally liable.

**E.     Monell Claims**

In Counts Two and Seven of the Complaint, Plaintiff alleges Monell causes of action against the City of Minneapolis. Count Two alleges Minneapolis failed to train or improperly trained its officers in how to arrest mentally ill individuals. Count Seven alleges that Minneapolis was deliberately indifferent to the use of excessive force by officers. As a general matter, municipalities are not subject to respondeat superior or vicarious liability under § 1983. Monell v. Department of Social Servs. of the City of New York, 436 U.S. 658, 694 (1978). However, a municipality can be held liable for its own wrongs when the enforcement of a policy or practice of the municipality results in the deprivation of federally protected rights. Id. at 694. To demonstrate Minneapolis' liability under a Monell claim, the Plaintiff must show that a policy or custom of Minneapolis was the "moving force [behind] the constitutional violation." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citation omitted).

Plaintiff's Monell claims fail for two reasons. First, as previously discussed, Plaintiff has failed to demonstrate a constitutional violation. Because Sanders' claim of excessive force failed, the predicate of a Monell claim does not exist. Second, even if Plaintiff was able to prove that Sanders' had been denied his constitutional rights, the Monell claim must fail for lack of evidence. Although Plaintiff makes numerous allegations regarding the customs and policies of

Minneapolis in dealing with mentally ill arrestees and excessive force, the sole evidence proffered in support of these claims is a Department of Justice bulletin [Docket No. 156] discussing the Memphis, Tennessee Police Department's Crisis Intervention Team and its model for responding to mentally ill individuals. However, no evidence has been presented to demonstrate that any policy or custom of Minneapolis resulted in constitutional violations. Moreover, no authority has been offered to suggest that the model proposed by the Memphis' Crisis Intervention Team is constitutionally required. Because Plaintiff can not demonstrate that Sanders suffered a constitutional violation and because Plaintiff has presented no evidence of any custom or policy of Minneapolis, the Monell claims fail.

**F.      Defendants' Motion for Sanctions**

Defendants have moved for sanctions against Plaintiff's attorney Richard Olivito for failure to withdraw Plaintiff's expert witness. On August 17, 2005, Defendants filed a Joint Motion to Disqualify Robert Mieczkowski as an Expert Witness [Docket No. 87], alleging that Mieczkowski was unqualified to testify in the areas of police training, forensic firearms, and accident reconstruction, among other topics. During the deposition of Mieczkowski, Defendants learned that many of the claims and experiences listed in Mieczkowski's curriculum vitae were either misrepresentations or falsehoods. As a result, Defendants asked Plaintiff's counsel to withdraw Mieczkowski on July 18, 2005. Eads Aff. II Ex. 1. Plaintiff's attorney responded on July 21, 2005, asking for ten to fourteen days to consider the Defendants' request. Eads Aff. Ex. 2. Plaintiff failed to comply with his own suggested time frame; consequently, Defendants filed the Joint Motion to Strike Mieczkowski. It was not until October 7, 2005, that Defendants received a message from Plaintiff's attorney withdrawing Mieczkowski. Walther Aff. II [Docket

No. 119] Ex. A.  Defendants seek fees and costs in excess of $40,000 associated with the Joint Motion for Sanctions.  See Docket Nos. 119-121.

In addition to the issue of Plaintiff's expert, this case has been fraught with procedural errors.  Plaintiff's initial responses to Defendants' Motions for Summary Judgment were stricken by Magistrate Judge Arthur Boylan because Plaintiff's opposition briefs exceeded applicable word limits.  See Docket No. 114.  Judge Boylan also noted that Plaintiff's attorney had failed to procure local counsel, and therefore prohibited Plaintiff's attorney from making any further filings without local counsel.  Id.  Finally, after refiling his responses to Defendants' Motions just days before the summary judgment hearing, Plaintiff's attorney failed to file supporting documentation until weeks after the hearing was held.

There is little question that the actions of Plaintiff's attorney have led to unnecessary costs for the Defendants.  Consequently, Plaintiff's attorney Richard Olivito will be sanctioned $4500 to be apportioned as follows: $2000 to Steven Manhood, $2000 to Josef Garcia and Augsburg College, and $500 to the City of Minneapolis and its Defendant police officers.  Additionally, a copy of this Order will be forwarded to the Supreme Court of Ohio's Board of Commissioners on Grievances and Discipline for their consideration in evaluating counsel's ability to represent clients.[5]

---

[5] It should be noted that local counsel Karlowba Powell was not involved in this action until after the incidents that are the subject of these sanctions occurred, and has not committed any sanctionable offenses.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants City of Minneapolis, Robert Olson, Valorie Goligowski, Hien Dinh, Lupe Herrera, and Matthew Blade's Motion for Summary Judgment [Docket No. 41] is **GRANTED**;

2. Defendants Josef Garcia and Augsburg College Security's Motion for Summary Judgment [Docket No. 81] is **GRANTED**;

3. Defendant Steven Manhood's Motion for Summary Judgment [Docket No. 38] is **GRANTED**; and

4. Defendants' Motion for Sanctions [Docket No. 116] is **GRANTED** and Richard Olivito is ordered to pay $2000 to Steven Manhood, $2000 to Josef Garcia and Augsburg College, and $500 to the City of Minneapolis and its Defendant police officers.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 23, 2005.